Filed 10/29/25  P. v. Tamayo CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B340557 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA031504) |
| v. | |
| CHRISTIAN TAMAYO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Judge.  Affirmed.

Bess Stiffelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After a jury convicted appellant Christian Tamayo of first degree murder, attempted murder, and mayhem—crimes he committed when he was 16 years old—the court sentenced him to a total of 46 years to life in prison. Nearly three decades later, Tamayo petitioned the superior court to recall his sentence pursuant to Penal Code section 1170, subdivision (d)(1)(A) (section 1170(d)(1)(A)).[1] The court summarily denied his petition, finding he had not been sentenced to life imprisonment without the possibility of parole (LWOP) or its functional equivalent.

On appeal, Tamayo argues the court erred because in *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*), our Supreme Court held that a sentence of 50 years to life imposed on a juvenile offender was the functional equivalent of LWOP, and implied that a sentence of 44 years to life—a sentence two years shorter than Tamayo's—could be as well.

We conclude that our high court's analysis in *Contreras* is inapplicable because the Court was not considering functional equivalence in the context of section 1170(d)(1)(A).[2] Tamayo provides no authority similarly holding that a sentence of 50 years to life—let alone 46 years to life—is the functional

---

[1] (§ 1170(d)(1)(A) ["When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing"].) Undesignated statutory references are to the Penal Code.

[2] Thus, we need not consider whether a 46-year-to-life sentence would be permitted under *Contreras*.

equivalent of LWOP in the context of section 1170(d)(1)(A), and we are not persuaded it is. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Tamayo Is Convicted of Murder*

In 1996, a jury convicted Tamayo of the first degree murder of Steven Mendoza, the attempted murder of Stephen Asinas, and mayhem against Asinas. The jury also found that Tamayo used a handgun to commit all three crimes, that he inflicted great bodily injury upon Asinas during the attempted murder, and that he committed all three crimes for the benefit of, at the direction of, and in association with a criminal street gang. Tamayo committed the crimes in January 1995, when he was 16 years old.

In January 1997, the court sentenced Tamayo to a total of 46 years to life, consisting of: (1) 25 years to life for murder, plus an additional ten years for using a handgun during the crime, plus an additional three years for committing the crime for the benefit of a criminal street gang, both to run consecutively; and (2) five years for attempted murder, plus an additional three years for using a handgun during the crime, both also to run consecutively.[3] Tamayo received a total credit for 329 days in custody.

_____

[3] The court also imposed a sentence enhancement for the infliction of great bodily injury to run concurrently. Additionally, the court sentenced Tamayo to ten years for the mayhem conviction—four years for mayhem, plus an additional six years for using a firearm to commit the crime—but did not impose it pursuant to section 654.

3

Tamayo appealed his conviction.  We ordered the trial court to prepare an amended abstract of judgment "deleting the stayed three-year great bodily injury enhancement from Tamayo's count II sentence [for attempted murder]" but otherwise affirmed. (*People v. Tamayo* (Oct. 15, 1998, B109425) [nonpub. opn.].)

## B.    *Tamayo Petitions to Recall the Sentence*

In June 2024, Tamayo petitioned the superior court to recall his sentence pursuant to section 1170(d)(1)(A), contending his sentence was "the functional equivalent of life without the possibility of parole."[4]  Tamayo included no evidence or argument that the sentence would exceed his expected lifespan.

In July 2024, the superior court summarily denied Tamayo's petition, finding he "was not sentenced to imprisonment for life without the possibility of parole or its functional equivalent."  Tamayo timely appealed.

## DISCUSSION

Section 1170(d)(1)(A) provides:  "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for

---

[4] Once recalled, Tamayo asked the court to transfer the case to juvenile court, pursuant to Proposition 57.  Proposition 57 "amended the law governing the punishment of juvenile offenses in adult criminal court by requiring hearings to determine whether the offenses should instead be heard in juvenile court." (*People v. Padilla* (2022) 13 Cal.5th 152, 158.)  Our Supreme Court held the proposition applied retroactively when a defendant's "case became nonfinal when his sentence was vacated on habeas corpus."  (*Id.* at p. 170.)

at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." In *People v. Heard* (2022) 83 Cal.App.5th 608, 612 (*Heard*), the appellate court held that "denying juvenile offenders, who were sentenced to the functional equivalent of life without parole, the opportunity to petition for resentencing [under section 1170(d)(1)(A)] violates the guarantee of equal protection." Finally, in *Contreras*, our Supreme Court held that sentencing a juvenile nonhomicide offender to 50 years to life in prison violated the Eighth Amendment's guarantee against cruel and unusual punishment because it was the "functional equivalent" of LWOP, while implying that sentences of less than 50 years to life might also violate the Eighth Amendment.

Based on these authorities, Tamayo argues the superior court erred in finding his 46-year-to-life sentence was not the functional equivalent of LWOP. He also criticizes the recent case of *People v. Munoz* (2025) 110 Cal.App.5th 499, review granted June 25, 2025, S290828 (*Munoz*), which, in a split decision, found *Contreras* inapplicable to determining whether a 50-year-to-life sentence for a defendant convicted of murder was functionally equivalent to LWOP for purposes of section 1170(d)(1)(A). (*Id.* at pp. 510–511.)

Whether Tamayo is eligible to petition for a recall and resentencing under section 1170(d)(1)(A) is a question of statutory interpretation we review de novo. (*People v. Walker* (2024) 16 Cal.5th 1024, 1032.)

5

**A.** *The Supreme Court Did Not Hold 50-Year-to-Life Sentences Were the Functional Equivalent of LWOP for All Purposes*

Tamayo argues his sentence "is the functional equivalent of LWOP under the analysis established in *Contreras*." (Initial capitalization removed.) Whether it is the functional equivalent of LWOP under *Contreras* is immaterial because *Contreras* did not consider whether a sentence was the functional equivalent of LWOP for purposes of section 1170(d)(1)(A).

In *Contreras*, our high court analyzed whether sentences of 50 and 58 years to life imposed on juvenile nonhomicide offenders violated the Eighth Amendment as outlined by the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*). (*Contreras*, *supra*, 4 Cal.5th at p. 367.) Our Supreme Court noted "the issue of functional equivalence in this context is not limited to determining whether a term-of-years sentence is actuarially equivalent to LWOP." (*Id.* at p. 364.) Instead, "there is a separate and distinct question whether a lengthy term-of-years sentence, though not clearly exceeding a juvenile offender's natural lifespan, may nonetheless impinge on the same substantive concerns that make the imposition of LWOP on juvenile nonhomicide offenders impermissible under the Eighth Amendment." (*Ibid.*) It was this question the Court considered. (*Ibid.*)

In doing so, the Court held that, under *Graham*, a lawful sentence must give the defendant " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Contreras*, *supra*, 4 Cal.5th at p. 367.) It "must recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability.' " (*Ibid.*) It "must offer 'hope of

6

restoration' [citation], 'a chance to demonstrate maturity and reform' [citation], a 'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society' [citation].  A lawful sentence must offer 'the opportunity to achieve maturity of judgment and self-recognition of human worth and potential.' [Citation.]  A lawful sentence must offer the juvenile offender an 'incentive to become a responsible individual.' " (*Ibid.*)  After considering these requirements, our Supreme Court concluded a 50-year-to-life sentence fell short of giving the defendant " 'the realistic chance for release contemplated by *Graham*' " and thus was "functionally equivalent to LWOP."  (*Id.* at pp. 368, 369.)[5]

_____

[5] Additionally, when discussing the dissent's contention that "regardless of whether defendants' original sentences are valid, the recent legislation authorizing elderly parole means 'both defendants will have an opportunity for parole at age 60,' and '[a] sentence offering an opportunity for parole no later than age 60 is not invalid under *Graham*,' " the majority mused "it is not clear that elderly parole eligibility after 44 years in prison would provide the 16-year-old nonhomicide offenders in this case with the 'hope of restoration' and realistic opportunity to reintegrate into society that *Graham* requires."  (*Contreras*, *supra*, 4 Cal.5th at pp. 374, 377.)  Moreover, in discussing a United States Supreme Court case considering "whether Virginia's geriatric release program provides a meaningful opportunity for a juvenile nonhomicide offender to obtain release based on demonstrated maturity and rehabilitation," our Supreme Court mentioned the United States Supreme Court's recognition that "there is a reasonable argument that even an elderly parole process that considers normal parole factors could, in practice, fail to provide a meaningful opportunity for release and that incarcerating a juvenile nonhomicide offender for 40 years or more without parole eligibility is simply too long under *Graham*."  (*Id.* at pp. 377–378.)

But *Contreras*'s conclusion that a 50-year-to-life sentence violates the Eighth Amendment, and its contemplations on whether a 40-year-to-life or 44-year-to-life sentence might also violate the Eighth Amendment, do not mean that Tamayo's sentence is the functional equivalent of LWOP for the purposes of section 1170(d)(1)(A).  (See *People v. Hardin* (2024) 15 Cal.5th 834, 863 ["We have not held that a lengthy term-of-years sentence is necessarily equivalent to a life without parole sentence for all purposes"] (*Hardin*); *People v. Williams* (2024) 17 Cal.5th 99, 131 ["equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile LWOP sentencing"] (*Williams*); *People v. Thompson* (2025) 112 Cal.App.5th 1058, 1073 [*Contreras* court's limitation of its analysis to Eighth Amendment "important, particularly in light of the court's subsequent statements in *Hardin* and *Williams* rejecting attempts to collapse the separate Eighth and Fourteenth Amendment analyses into one"], review granted Sept. 24, 2025, S292540 (*Thompson*); *People v. Baldwin* (2025) 113 Cal.App.5th 978, 985 ["equal protection analysis to section 1170(d) requires 'an equal protection specific' analysis that is not centered on Eighth Amendment concerns"] (*Baldwin*).)

### B. *The Court Did Not Err in Denying Tamayo's Petition*

#### 1. Eighth Amendment Concerns Are Not the Same as Equal Protection Concerns

In *Munoz*, our colleagues in Division Seven addressed whether a superior court erred in denying a defendant's section

8

1170(d)(1)(A) petition when that defendant was sentenced to 50 years to life for murder.  (*Munoz*, *supra*, 110 Cal.App.5th at pp. 502–503, rev.gr.)  In a split decision, the majority concluded his sentence was not the functional equivalent of LWOP and affirmed.  (*Id.* at p. 503.)  They also concluded *Contreras* required no different result, both because the *Contreras* defendants did not commit murder and because *Contreras* "considered only whether the defendants' sentences violated the Eighth Amendment."  (*Id.* at pp. 510–511.)

Tamayo urges us to disregard the *Munoz* majority and ignore the Eighth Amendment context of *Contreras* because "[t]here is no logical reason to distinguish what constitutes de facto LWOP for a juvenile offender in a section 1170, subdivision (d)(1) context as opposed to what constitutes de facto LWOP for a juvenile offender for the purpose of the Eighth Amendment."  We disagree.

Citing *In re Kirchner* (2017) 2 Cal.5th 1040, Tamayo admits section 1170(d)(1)(A) "was never designed to correct constitutional violations."  And Tamayo does not argue his sentence is unconstitutionally cruel and unusual.[6]  Instead, by invoking *Heard*, Tamayo is arguing that denying him the benefits of section 1170(d)(1)(A) violates his right to equal protection.

"[I]n contrast to a cruel and unusual punishment analysis, the equal protection inquiry asks whether there is a rational basis for the Legislature to treat certain individuals differently

---

[6] He acknowledges that "[t]he possibility of youth offender parole under section 3051, which, unlike 1170, subdivision (d)(1), was explicitly enacted to address constitutional concerns, . . . moots any Eighth Amendment challenge to a lengthy noncapital sentence for a juvenile offense."

9

when prescribing the consequences under an ameliorative statute . . . .  'The Equal Protection Clause confers no substantive rights and creates no substantive liberties.  The function of the Equal Protection Clause, rather, is simply to measure the validity of classifications created by state laws.' "  (*Williams*, *supra*, 17 Cal.5th at p. 133.)

"We find a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose."  (*People v. Chatman* (2018) 4 Cal.5th 277, 288–289.)  "This core feature of equal protection sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny.  Coupled with a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair."  (*Ibid.*)

In other words, for the issue before us, it matters not whether Tamayo's sentence provides him with "hope of restoration," which is a concern under the Eighth Amendment.  It matters only whether the Legislature had a rational basis for treating Tamayo differently than a person sentenced to LWOP for purposes of the relief offered by section 1170(d)(1)(A).

### 2.  There Is a Rational Basis for the Differentiation of Sentences Like Tamayo's

What is now section 1170(d)(1)(A) was added by Senate Bill 9.  (*Heard*, *supra,* 83 Cal.App.5th at p. 617.)  "[T]he legislative history of Senate Bill No. 9 indicates that while *Graham* violations and cruel or disproportionate sentences imposed on

juveniles were the Legislature's general considerations in enacting section 1170(d), it was expressly concerned about juveniles being sentenced to *die* in prison.  [¶]  For example, an Assembly Committee Appropriations analysis provided the following rationale for the legislation:  'The authors and supporters contend sentencing minors to die in prison is barbaric, counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world.  This bill, rather than prohibiting LWOP for minors, simply authorizes a judicial process for reviewing and re-sentencing.  Re-sentencing, should it occur, would result in a life sentence, but one with the possibility of parole, based on the evaluation of the Board of Parole Hearings.  Offenders would still serve decades in prison.' " (*Thompson*, *supra*, 112 Cal.App.5th at p. 1075, rev.gr.; see also *Baldwin*, *supra*, 113 Cal.App.5th at p. 997.)

After reviewing other parts of the bill's legislative history, *Thompson* concluded the "history suggests the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences.  Instead, a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison." (*Thompson*, *supra*, 112 Cal.App.5th at p. 1076, rev.gr.; see also *Baldwin*, *supra*, 113 Cal.App.5th at p. 997.) Thus, "[a]t the time of enactment, the Legislature could reasonably consider life without parole to be the most severe and unjust punishment imposed on juvenile offenders.  While both life without parole and 50-year-to-life sentences are now deemed unconstitutionally excessive punishment when imposed on juvenile offenders, the Legislature could rationally conclude that providing the relatively small number of juvenile offenders

11

otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson*, at p. 1077.) "A desire to avoid condemning minors to die in prison is obviously a valid reason for the Legislature to grant relief to explicit LWOP offenders." (*People v. Sorto* (2024) 104 Cal.App.5th 435, 451 (*Sorto*).)

Tamayo also argues "[t]he less culpable group of offenders sentenced to the functional equivalent of LWOP cannot be denied a benefit provided to those more culpable and sentenced to LWOP." While we disagree with the premise of this argument—that Tamayo and others like him were sentenced to the functional equivalent of LWOP—we note the Legislature "may rationally provide a rehabilitative benefit to a group of offenders who committed more serious crimes, while excluding those convicted of lesser crimes, when the less culpable group may have other avenues for relief." (*Thompson*, *supra*, 112 Cal.App.5th at p. 1080, rev.gr.)

"For example, juvenile offenders sentenced to 50 years to life might accrue conduct credits while in prison that would meaningfully shorten their sentences, while a life without parole sentence could not be modified by credits, even if accrued." (*Thompson*, *supra*, 112 Cal.App.5th at p. 1080, rev.gr.) "Likewise, the Legislature could rationally distinguish between life without parole and 50-year-to-life sentences based on differing prison conditions of the two groups. That 'it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration' [citation], would provide the Legislature with reason to give life without parole juvenile offenders in particular an opportunity to be resentenced to a life with parole sentence.

12

The Legislature could rationally presume that an offender serving 50 years to life would already have been able to participate in such programs. 'Equal protection "does not prohibit the Legislature from regulating certain classes of cases in which the need is deemed most evident." ' " (*Ibid.*)

An equal protection challenge "concerns only the constitutional permissibility of the lines the Legislature has drawn. It is not for us to pass judgment on the wisdom or desirability of its policy choices." (*Hardin, supra*, 15 Cal.5th at p. 864.) " 'If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " ' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.' " (*Id.* at p. 852.)

### 3. We Do Not Consider the Studies Tamayo Presents for the First Time on Appeal

In his appellate brief, Tamayo cites a litany of studies that he claims demonstrate he is likely to die before he is eligible for parole under his 46-year-to-life sentence.[7] Like the appellants in *Thompson* and *Munoz*, we note Tamayo presented none of these studies to the trial court. "We agree with the *Munoz* court that 'we cannot evaluate their untested validity' and therefore have a basis to disregard them." (*Thompson, supra*, 112 Cal.App.5th at p. 1077, rev.gr.) These are factual assertions to which the district attorney should have been given a chance to respond, and about

---

[7] We note Tamayo was entitled to a youth offender parole hearing beginning in his 25th year of incarceration and will be entitled to an elderly parole hearing when he reaches the age of 50 in 2028. (§§ 3051 & 3055.)

which the superior court should have been given a chance to make findings.[8]  Moreover, "it is typically the function of the Legislature, not the courts, to sift through studies and research and to make policy decisions." (*Munoz*, *supra*, 110 Cal.App.5th at p. 509, rev.gr.)

Even were we to accept Tamayo's new claims about life expectancy, "it remains the case that, . . . as between juvenile offenders sentenced to 50 years to life and those sentenced to life without parole, only the latter category had a 100 percent chance of dying in prison.  This was a distinction the Legislature could rationally take into account.  To address the overly harsh and unjust punishment of juvenile offenders, even if that punishment was lawfully imposed, the Legislature was 'entitled to proceed incrementally, so long as it proceeds rationally, in "walking [the] tightrope" of the political process.' [Citation.]  ' "Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful

---

[8] Citing the dissent in *Munoz*, Tamayo also contends the data he presents in his brief "is not data which validity needs to be evaluated or tested; it is 'raw data collected by the California prison system's health care services agency on recorded inmate deaths (not statistical estimates of life expectancies).' "  Even were this true, by presenting this data for the first time on appeal, Tamayo deprives the prosecution the chance to present other, conflicting data, and the superior court the chance to make factual findings based on the data before it (or, alternatively, concluding such findings should be left to the Legislature).

discrimination." ' " (*Thompson, supra*, 112 Cal.App.5th at p. 1078, rev.gr.)[9]

We conclude Tamayo "has not shown that the Legislature's decision to address one aspect of the problem of the punishment of juvenile offenders in section 1170(d) (i.e., death in prison), was irrational because it did not also remedy other ways in which courts have found juvenile punishment invalid (i.e., no meaningful opportunity to rejoin society)." (*Thompson, supra*, 112 Cal.App.5th at p. 1079, rev.gr.)

---

[9] Thus, Tamayo's citations to *Heard*, *Sorto*, and *People v. Bagsby* (2024) 106 Cal.App.5th 1040 are unhelpful because, unlike Tamayo, the defendants in those cases had a 100 percent chance of dying in prison. (*Heard, supra*, 83 Cal.App.5th at p. 612 [defendant sentenced to 103 years to life]; *Sorto, supra*, 104 Cal.App.5th at p. 440 [defendant sentenced to 140 years to life]; *Bagsby*, at p. 1046 [defendant sentenced to 107 years to life].) (See *Baldwin, supra*, 113 Cal.App.5th at p. 1004 ["A term of years that offers parole eligibility at 60 years of age is not a sentence that guarantees death in prison, like LWOP or like sentences of 103 years to life [citation], 140 years to life [citation] and 107 years to life [citation]"].) Even without considering Tamayo's entitlement to a youth offender parole hearing beginning in his 25th year of incarceration and his entitlement to an elderly parole hearing when he reaches the age of 50 in 2028, Tamayo admits that, under his original sentence, "he would first be eligible for parole at 62 years old." Such a sentence does not "guarantee[] death in prison."

**DISPOSITION**

The superior court's order is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.